UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ERICK HERNANDEZ,

        Plaintiff,

        v.

DALE NELSON, *et al.,*

        Defendants.

Case No. C08-5242 FDB/KLS

REPORT AND RECOMMENDATION

**NOTED FOR: July 17, 2009**

        Before the Court is the motion for summary judgment of Defendants Dale Nelson, George Wigen, B. Gabalis and [Carl] Jason Sadler[1]. Dkt. 12. Defendants move for summary dismissal of Plaintiff Erick Hernandez's claims against them on the grounds that Mr. Hernandez, as an immigration detainee at the Northwest Detention Center (NWDC), is not entitled to claim individual liability against them, as employees of a private corporation, under *Bivens v. Six Unknown Fed. Narcotics Agents*, 430 U.S. 388 (1971). The GEO Defendants also argue that they did not violate Mr. Hernandez's constitutional rights and that Mr. Hernandez is not entitled to pursue a claim under *Bivens* because there are adequate state law remedies available and/or because he was afforded due process through internal grievance procedures. Dkt. 12, pp. 5-10. In support of their motion, Defendants rely on their declarations and the conditions and regulations applicable

---

[1]The remaining defendant, Dave Jennings, is a federal U.S. Immigration and Customs Enforcement (ICE) officer, who is represented by the United States Attorney General's Office. He has not joined in this motion.

1  to detainee correspondence set forth in the policies and procedure manuals in use at the NWDC.

2  Dkts. 13-16.

3      Mr. Hernandez's brief in opposition was due on November 24, 2008. Instead of a response,

4  on November 10, 2008 Mr. Hernandez urged that the motion for summary judgment be delayed

5  until the completion of discovery. Dkt. 19. The Court denied the motion but granted Mr.

6  Hernandez an extension to file his response. Dkt. 22, p. 2. Mr. Hernandez has not filed a response.

7  Under Local Rule 7 (b)(2) failure to file papers in opposition to a motion may be deemed by the

8  Court as an admission that the motion has merit.

9      Having carefully reviewed the motion and balance of the record, and viewing the evidence

10  in the light most favorable to Mr. Hernandez, the undersigned recommends that Defendants' motion

11  for summary judgment be denied on the grounds that Mr. Hernandez is entitled to sue the GEO

12  Defendants under *Bivens*, but granted because there are no issues of material facts that the GEO

13  Defendants violated any of their own rules and no evidence that the GEO Defendants violated any

14  of Mr. Hernandez's constitutional rights.

15                    **BACKGROUND**

16      Mr. Hernandez is a detainee at NWDC, a federal immigration detention facility administered

17  under contract by The GEO Group, Inc.[2]  The moving defendants are employees of The GEO

18  Group, Inc. (GEO Defendants).

19      Mr. Hernandez alleges that he placed a sealed envelope in the mail addressed to a former

20  detainee, Aboulaye Diallo, which contained an invoice from U.S. News and World Report. Dkt. 8,

21  p. 5. The invoice belongs to a fellow detainee, Antolin Andrew Marks. *Id*. Mr. Hernandez alleges

22  that the GEO Defendants opened and read his mail outside of his presence in violation of the

23  written policies set forth in the ICE National Detainee Handbook. He also asserts that his mail was

24  _____

25  [2] See http://www.thegeogroupinc.com/northamerica.asp?fid=105; http://www.ice.gov/pi/dro/facilities/
tacoma.htm.

26  REPORT AND RECOMMENDATION - 2

opened in retaliation against him because he previously assisted Mr. Marks by submitting a

declaration in litigation being pursued by Mr. Marks in an unrelated case (*Antolin Andrew Marks v.*

*John P. Torres*, No. 07-1660 EGS). *Id.*, pp. 7-8. Mr. Hernandez alleges that the GEO Defendants

opened his mail with the specific intent to find evidence to prevent Mr. Marks from assisting him

and others in the legal library. *Id.*, p. 8. He also alleges that he has been prejudiced because the

GEO Defendants have been opening his legal mail as well as his regular correspondence. *Id.*, p. 7.

Mr. Hernandez claims that the GEO Defendants have failed to follow their own rules and by

their actions, Defendants threaten the "sanctity of the ICE National Standards and they have no

penological interest in opening the outgoing correspondence of the Plaintiff where it was clear that

there was no contraband." Dkt. 8, pp. 7-8. Mr. Hernandez argues that the GEO Defendants' failure

to follow their own rules resulted in a violation of his First Amendment rights and his "Accardi"

rights.[3] Dkt. 8, p. 7.[4]

## SUMMARY JUDGMENT STANDARD

The moving party must demonstrate the absence of a genuine issue of fact for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion

that a genuine issue of material fact exists does not preclude summary judgment. *California*

*Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.

1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose

existence might affect the outcome of the suit," and the materiality of which is "determined by the

substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors*

[3]*United States ex rel. Accardi v. Shaugnessy*, 347 U.S. 260 (1954). *Accardi* is a habeas action where the petitioner attacked the validity of the denial of his application for suspension of deportation. *Id.* at 261. The Supreme Court held that regulations with the force and effect of law prescribe the procedure to follow in processing an alien's application for suspension of deportation. *Id.* at 266.

[4]The GEO Defendants refer to Dkt. 4, which was Mr. Hernandez's original complaint. However, Mr. Hernandez filed an Amended Complaint at the Court's direction on May 29, 2008 to include a demand for relief. Dkt. 8.

REPORT AND RECOMMENDATION - 3

*Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In examining Defendants' motion, the Court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

## STATEMENT OF FACTS

The following recitations of facts is based on the verified complaint, and the declarations and exhibits filed in support of Defendants' motion.

The GEO Group, Inc. Policy and Procedural Manual relating to Detainee Correspondence, contains the following policies, which may be relevant to Mr. Hernandez's claims relating to his outgoing mail:

> Policy 5.2.1 ¶ III B: Incoming and outgoing general correspondence are subject to monitoring, reading, and inspection typically in the presence of the detainee. Only the Warden can authorize the inspection of general correspondence without the detainee being present.

> Policy 5.2.1 ¶ IV E: Outgoing general correspondence and other mail may be inspected and/or read if the addressee is another detainee or if there is reasons to

REPORT AND RECOMMENDATION - 4

believe the item might present a threat to the facility's security or orderly operation, endanger the recipient or the public, or might facilitate criminal activity. The detainee must be present when the correspondence or other mail including packages is inspected unless otherwise authorized by the Warden.

Policy 5.2.1 ¶ IV F:    Rejection of Incoming and Outgoing Mail:
2.        Outgoing mail is sent out unopened and not inspected unless:
a.        There is reason to believe it would interfere with the orderly operation and security of the facility, that it would be threatening to the recipient, or that it would facilitate criminal activity; ...

Dkt. 13, Exh. A, pp. 6-7; 11.[5]

Policy 5.2.1 ¶ III B provides that only the Warden can authorize the inspection of general correspondence without the detainee being present. Dkt. 13, pp. 6-7.[6]

The ICE National Detainee Handbook provides that all incoming and outgoing letters are subject to inspection, for content and contraband. Dkt. 24, p. 17. In addition, detainees may send or receive mail to or from anyone they know personally. *Id.* They are required to write their name, their Alien or ID number and the facility address on the upper left-hand corner of the envelope of all outgoing mail. *Id.*

On or about March 28, 2008, Defendant Dale Nelson, a mail clerk at the NWDC, observed a suspicious envelope during her routine examination of outgoing mail. Dkt. 14, p. 1. Ms. Nelson examines outgoing mail for compliance with detention policies and procedures. *Id.*, pp. 1-2. All outgoing letters are subject to outer surface inspection for content and contraband. *Id.*, p. 2; Dkt. 13, p. 11 (Policy 5.2.1, ¶ III B). The envelope at issue in this matter appeared suspicious to Defendant Nelson because the envelope was addressed to a former detainee "Aboulaye Diallo." Dkt. 14, p. 2.

---

[5]For ease of reference CM/ECF page numbering is utilized herein.

[6]ICE National Detainee Handbook, § 25 Outgoing and Incoming Mail (CM/ECF page numbering). Defendants originally produced a copy of this handbook at Dkt.13, Exh. B, but the even pages were omitted in the CM/ECF filing. At the Court's direction, Defendants filed a complete copy of the handbook at Dkt. 24. For ease of reference, the Court shall cite to Dkt. 24 when referring to the Handbook.

REPORT AND RECOMMENDATION - 5

Ms. Nelson recognized this mail recipient as a known associate of detainee Antolin Andrew Marks, and not someone Mr. Hernandez would know. *Id.* Mail to another detainee is considered suspect by policy. Dkt. 13, p. 11 (Policy 5.2.1 at ¶ IV F.2.c). The Court notes, however, that the policy relates to "correspondence ... between detainees/inmates" and that as of March 28, 2008, Mr. Diallo was neither a detainee nor an inmate at the Detention Center.

Ms. Nelson also testified that detainees are authorized to send mail to people they know, but are not authorized to send mail to an unknown recipient on behalf of another detainee. Dkt. 14, p. 2. Ms. Nelson could see without opening the envelope that the envelope contained what appeared to be an invoice from U.S. News and World Report. *Id.* She suspected this was Mr. Marks' invoice and not that of Mr. Hernandez, primarily because she knew that Mr. Hernandez was not in detention when Mr. Diallo was detained and she knew that Mr. Marks knows Mr. Diallo. *Id.* Ms. Nelson also knew that an invoice from U.S. News and World Report had been logged in as incoming mail to Mr. Marks on March 17th a few days earlier. *Id.* Ms. Nelson reported her suspicions to the Warden. *Id.* She did not open the envelope and she did not read the mail. *Id.*

Upon receipt of the envelope from Ms. Nelson, Warden Wigen examined the outside of the envelope and came to the same conclusion as Ms. Nelson. Dkt. 13, p. 2. From the outside of the envelope, the words "U.S. News and World Report" were apparent. *Id.* To confirm, Warden Wigen opened the envelope and noted the invoice belonged to detainee Marks as his name was clearly printed on the address line and the introductory greeting. *Id.* The Warden returned the invoice to the envelope and turned the matter over to Associate Warden Sadler for investigation. *Id.* Warden Wigen did not read the mail beyond inspecting the greeting and affirming the invoice belonged to Mr. Marks. *Id.* Warden Wigen characterized the correspondence as contraband because the contents of the envelope belonged to Mr. Marks and not to Mr. Hernandez. *Id.*, p. 3.

Associate Warden Sadler did not read the correspondence and did not open the envelope. Dkt. 15, p. 2. He referred the matter to Mr. Gabalis for investigation. *Id.* Mr. Gabalis took a

statement from Mr. Hernandez.  Dkt. 16, p. 2. Mr. Hernandez explained he did not know the mail

recipient and that he mailed the invoice for Mr. Marks as a favor.  Dkt. 13, p. 53.  Mr. Gabalis

prepared an incident report consistent with policy and retained the envelope and invoice in a

contraband locker. Dkt. 16, p. 2.  The original remains intact at NWDC.  *Id*., s*ee also* Dkt.13, p. 55

(copy of incident report).

An Investigation Report signed by Officer Shelley dated April 8, 2008, states that Mr.

Hernandez "was calm and cooperative during the investigation.  Hernandez stated 'I mailed the

envelope for Rudder because he asked me too [sic]' and 'He's my friend so I did it just like any of

my other friends.'"  Dkt. 13, p. 56.   Under "Investigator's Comments and Conclusions ", Officer

Shelley noted: "Recommend 'UDC' For Charges 406."

A Unit Disciplinary Committee convened to hear Mr. Hernandez's case on April 9, 2008.

Dkt. 13, p. 57.  Under "Comments to Committee from Detainee Regarding the above incident," it is

noted:  "not guilty"; "if you think that's contraband, that's contraband"; "there [sic] your rules" and

"your [sic] the boss".  *Id*.  The Disciplinary Committee, chaired by Lt. Portillo, concurred with Lt.

Shelly's conclusion that Mr. Hernandez committed a prohibited act of Code 406.  *Id*.; Dkt. 13, p.

57; *see also,* Exh. C at 7 (violation of mail policy Code 406 is low level offense).   Mr. Hernandez

was sanctioned with 16 hours of work without pay.  Dkt. 13, p. 57.  On April 9, 2008, Mr.

Hernandez appealed the finding of guilt, requesting that the incident be expunged.  Dkt. 13, p. 58.

The appeal was denied on April 14, 2008.  *Id*.

**DISCUSSION**

**I.**    ***Bivens* Claim**

The Supreme Court's decision in *Bivens* authorizes a suit for damages against federal

officials for constitutional violations despite the absence of any federal statute creating liability.

403 U.S. 388.   To state a private cause of action under *Bivens* and its progeny, a plaintiff must

allege (1) that a right secured by the Constitution of the United States was violated; and (2) that the

alleged deprivation was committed by a federal actor. *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th

Cir. 1991)(Section 1983 and *Bivens* actions are identical except for the replacement of a state actor

under section 1983 by a federal actor under *Bivens*.).

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for

damages against federal officers alleged to have violated a citizen's constitutional rights."

*Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Specifically, the Supreme Court

held that "a victim of a Fourth Amendment violation by federal officers may bring suit for money

damages against the officers in federal court," even though Congress never provided for such right

of action and the Fourth Amendment did "not in so many words provide for its enforcement by

award of money damages for the consequences of its violation." *Id*. at 66-67 (quoting *Bivens*, 534

U.S. at 396). The Supreme Court "found an implied damages remedy," however, by "relying

largely on earlier decisions implying private damages actions into federal statutes," and by "finding

'no special factors counseling hesitation in the absence of affirmative action by Congress.'" *Id*.

(quoting *Bivens*, 534 U.S. at 395-97).

The Supreme Court's decision in *Malesko* expressly provides that for a *Bivens* remedy to be

available, a defendant must be an individual acting under federal governmental authority and the

plaintiff must have no other alternative remedy for the harm alleged:

> In 30 years of *Bivens* jurisprudence we have extended its holding only
> twice, to provide an otherwise nonexistent cause of action against
> *individual officers* alleged to have acted unconstitutionally, or to provide
> a cause of action for a plaintiff who lacked *any alternative remedy* for
> harms caused by an individual officer's unconstitutional conduct. Where
> such circumstances are not present, we have consistently rejected
> invitations to extend *Bivens* . . .

*Malesko*, 534 U.S. at 70 (emphasis in original). Both of these factors – an individual federal actor

against whom there exists no previous cause of action and a lack of any available alternative

remedy – must be present. The absence of either of these factors prohibits the application of

*Bivens*. See *Holly v. Scott*, 434 F.3d 287, 296 (4th Cir. 2006)("'[W]here [these two] circumstances

REPORT AND RECOMMENDATION - 8

are not present,' the Court has 'consistently rejected invitations' to enlarge the scope of the judicially created *Bivens* remedy.") (quoting *Malesko*, 534 U.S. at 70).

For Mr. Hernandez to be entitled to a remedy under *Bivens*, the Court must determine whether (1) as employees of the GEO Group, Inc., the GEO Defendants' actions were of a sufficiently federal character to create constitutional liability, and (2) Mr. Hernandez lacks an adequate alternative remedy against the GEO Defendants either under state law or otherwise.

### A.      Acting Under Color of Federal Law

The first question to decide here is whether the GEO defendants are to be treated as individual federal officers.[7] Neither the Supreme Court expressly nor the Ninth Circuit have been presented with the issue of whether *Bivens* applies to employees of private corporations.  Further, it does not appear that any federal statute expressly provides for or implies a private cause of action in this context, and the GEO defendants have not shown any intent on the part of Congress to make such available.  Thus, it seems Congress has been silent on this issue as well.  Any extension of *Bivens* in this case, therefore, would provide Mr. Hernandez with "an otherwise nonexistent cause of action." *Malesko*, 534 U.S. at 70.  The undersigned, accordingly, must determine whether the actions of the GEO defendants can be viewed as those of federal officers, that is, as actions which are sufficiently attributable to federal actors.  The undersigned finds that they are.

In *Holly,* as in this case, the defendants were employees of The GEO Group, Inc., which the Fourth Circuit noted none of the parties there had contested was "a wholly private corporation in which the federal government has no stake other than a contractual relationship." 434 F.3d at 291.  Declining to impute any liability under such a circumstance, the Court of Appeals stated that "[a]pplication of *Bivens* to private individuals simply does not find legislative sanction." *Id.* at 291-

---

[7]This Court has previously found that the detention of individuals charged with immigration violations or who are being held pending resolution of other immigration-related matters is an exclusively governmental function.  See *Bromfield v. McBurney, et al.*, No. C07-5226RBL/KLS.

92.  The Fourth Circuit went on to explain its holding as follows:

> The alleged actions of these defendants were not of a sufficiently federal
> character to create constitutional liability. Defendants are not federal
> officials, federal employees, or even independent contractors in the
> service of the federal government. Instead, they are employed by [The]
> GEO [Group, Inc.], a private corporation. There is no suggestion that the
> federal government has any stake, financial or otherwise, in [The] GEO
> [Group, Inc.]. . . . Nor is there any suggestion that federal policy played
> a part in defendants' alleged failure to provide adequate medical care, or
> that defendants colluded with federal officials in making the relevant
> decisions. . . . To be sure, [The] GEO [Group, Inc.], like a great many
> private corporations, does business under contract with the government.
> But this is not by itself enough to subject it to constitutional liability, . . .
> let alone to create such liability for its individual private employees.

*Id.* at 292-93 (internal citations omitted).

In the Ninth Circuit, however, "the private status of the defendant will not serve to defeat a *Bivens* claim, provided that the defendant engaged in federal action." *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1337-38 (9th Cir. 1987) (private status is not alone sufficient to counsel hesitation in implying damages remedy when private party defendants jointly participate with government to sufficient extent to be characterized as federal actors).  That is, *Bivens* liability may be applicable to constitutional violations committed by private individuals, but only if they act "under color of federal law," or, in other words, only if they are "federal actors." *Sarro v. Cornell Corrections, Inc.*, 248 F.Supp.2d 52, 59 (D.R.I. 2003).

In determining whether a party acts under color of federal law, courts should "look to the more established body of law that defines the analogous term -- under color of state law -- with regard to actions under 42 U.S.C. § 1983." *Bender v. General Services Administration*, 539 F.Supp.2d 702, 707 (S.D.N.Y. 2008); see also *Chin v. Bowen*, 833 F.2d 21, 24 (2nd Cir. 1987) (concepts of state action under section 1983 apply in determining whether action was taken under color of federal law for *Bivens* purposes); *Sarro*, 248 F.Supp.2d at 59 (tests for determining whether private party acts under color of federal law are similar to tests for determining whether private party acts under color of state law).  "[A] defendant acts 'under color of' state law where he exercises

power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Bender*, 539 F.Supp.2d at 707 (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).

Private parties, therefore, "can possess such power when they act in concert with the government." *Id*. ("To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'") (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Accordingly, while the GEO defendants here may not be federal officials, they "have acted under color of federal law if they have exercised power they have by virtue of federal law, or have jointly acted with the federal government or its agents." *Id*. at 708.

In *Bender*, the district court found the plaintiff had sufficiently alleged the defendants were acting under color of federal law. For example, the defendants "were contractual participants in the provision" of services for a federal government agency, and they were "clothed with apparent governmental authority because of their role as providers" of those services to that agency – a role the district court further noted they performed "for the benefit of the federal government," and for which they were "compensated from the federal budget." *Id*. Similarly, here, the GEO defendants are employees of a private entity that has contracted with the federal government to operate the Northwest Detention Center, a federal immigration detention facility. In their role as providers of that service, the GEO defendants were clothed with the apparent governmental authority to operate and maintain that facility – and, accordingly, all of the detainees, including plaintiff, held therein – which clearly is being done for the benefit of the federal government, and surely for which they, as employees, and The GEO Group, Inc. are being compensated.

The approach taken by the district court in *Bender* for determining whether the defendants in that case were acting under color of federal law, is just one of the tests employed for determining whether a private party has acted under color of state law. A good description of those tests and

their application has been set forth by the district court in *Sarro*:

> These tests include the "direct links" test, . . . (a direct link between private corporation and federal government establishes that corporation acted under color of federal law); the public function test, . . . (a private party performing a function traditionally the exclusive prerogative of the government is a government actor); the nexus test, . . . (a private party is a state actor when there is a sufficiently close nexus between the government and the challenged action of the private party that the action of the private party is fairly treated as that of the government itself); and the symbiotic relationship test, . . . (a private party is a state actor when the government has so far insinuated itself into a position of interdependence with that party that the government must be recognized as a joint participant in the challenged activity).
>
> . . .
>
> . . . these tests do not purport to exhaust the field of circumstances under which a private individual may be considered a federal actor by establishing a finite number of rigidly circumscribed pigeon holes within which particular conduct of a particular individual must precisely fit. Rather, the tests merely identify the factors that courts have applied in different contexts. . . . Because some of the factors are very similar, the tests may overlap.

248 F.Supp.2d at 59 (internal citations omitted).

In *Sarro*, the district court employed the "public function" test to find the defendants – employees of a privately-operated facility housing federal prisoners awaiting trial – exercised "powers traditionally exclusively reserved to the government," and thus were government actors. *Id.* at 60 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). In *Holly*, the Fourth Circuit arrived at a different conclusion, finding that "correctional functions" had "never been exclusively public," because "private operation of jails and prisons existed in the United States" as far back as "the eighteenth and nineteenth centuries." 434 F.3d at 293 (quoting *Richardson v. McKnight*, 521 U.S. 399, 405 (1997). Thus, the Court of Appeals held that "the operations of prisons is not a 'public function.'" *Id.*

The undersigned finds, however, the approach taken by the district court in *Sarro* on this issue to be more persuasive. Thus, "an activity may satisfy the public function test if it is performed

REPORT AND RECOMMENDATION - 12

under the aegis of governmental authority." *Sarro*, 248 F.Supp.2d at 60 (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991)). "Even if the function must be one that traditionally has been exclusively performed by the government," furthermore, "the incarceration of individuals accused of committing crimes is such a function." *Id.* Accordingly, "the fact that the function of detaining individuals charged with crimes, sometimes, has been delegated to and performed by private parties does not prevent the function, itself, from being an exclusively governmental function." *Id.* The *Sarro* court went on to explain its decision in further detail as follows:

> Clearly, the detention of individuals charged with committing crimes is an exclusively governmental function. Only the government has the authority to imprison a person and the exclusive governmental nature of that function is not altered by the fact that, occasionally, the government may contract to have criminal defendants incarcerated at privately-operated institutions.
>
> Here, Sarro and the other individuals incarcerated at Wyatt had been arrested by federal law enforcement agents and charged with federal crimes. They were being detained under authority of the United States government pending disposition of the charges against them. By law, they were in the custody of the United States Marshal who exercised ultimate authority over them. . . . The power to detain them was derived solely and exclusively from federal authority and the defendants, in effect, acted as the Marshal's alter ego. The fact that the Marshal temporarily delegated the task of detaining those prisoners to the defendants did not convert that detention into anything other than an exclusively governmental function. . . . ("The function of incarcerating people, whether done publically or privately, is the exclusive prerogative of the state. This is a truly unique function and has been traditionally and exclusively reserved to the state.").

*Id.* at 61 (internal citations omitted).[8]

---

[8]This explanation of the particular governmental "function" that is at issue in the public function test is more logical, and thus more persuasive, than the Fourth Circuit's much narrower view thereof:

> Holly . . . urges that the "function" to which we should look is not the administration of a prison, but rather the power to keep prisoners under lock and key. This argument misapprehends the proper nature of our inquiry. In determining the presence of state action, we are not to conduct a far-flung investigation into all of a defendant's possible activities, but rather must focus on "'the specific conduct of which the plaintiff complains.'"

*Holly*, 434 F.2d at 293 (finding that provision of medical care to prison inmate at private prison arose out of defendants'

REPORT AND RECOMMENDATION - 13

The detention of individuals who have been charged with immigration violations or are being held pending the resolution of other immigration-related matters, would appear to be even more clearly an exclusively governmental function. Indeed, it seems to be a function exclusive to the federal government, as no showing has been made that the states have the power to exercise such authority. Nor has it been shown that the federal government historically has contracted with private corporations or other entities to administer the detention of immigrants, even if that were a valid basis for finding an absence of exclusive governmental authority in this area. That is, as found by the district court in *Sarro*, because the power to detain immigrants is derived solely and exclusively from federal authority, the GEO defendants, in effect, acted as the government's alter ego in detaining Mr. Hernandez, and the fact that the task of detaining Mr. Hernandez and other immigrants was temporarily delegated to the GEO defendants does not convert that detention into anything other than an exclusively governmental function.[9]

---

operation of prison and not out of fact of inmate's incarceration, and therefore did not constitute public function) (citations omitted). In addition, the undersigned finds that no "far-flung investigation" into the GEO defendants' activities is needed here, as it is quite clear that the particular governmental function at issue in this case is the detention of individuals charged with immigration violations or pending other immigration-related matters.

[9]*See U.S. v. Thomas,* 240 F.3d 445 (5th Cir. 2001), which found a guard at a privately-operated detention center under contract with the United States Immigration and Naturalization Service ("INS") to be a "public official" for purposes of the Federal Bribery Statute, 18 U.S.C. § 201(a)(1), (b)(2):

> Thomas was a "public official", as defined by § 201(a)(1). As a corrections officer for CCA [Corrections Corporation of America], which contracted with the INS to house federal detainees, Thomas performed the same duties, and had the same responsibilities, as a federal corrections officer employed at a federal prison facility. Although he did not have any authority to allocate federal resources, . . . Thomas nevertheless occupied a position of public trust with official federal responsibilities, because he acted on behalf of the United States under the authority of a federal agency which had contracted with his employer. . . . Pursuant to CCA's contract with the INS, CCA correctional officers had to abide by federal regulations; the rules and regulations regarding the standards of conduct for CCA correctional officers, including not bringing contraband into the prison, were subject to INS approval; and any employee who violated those standards could be dismissed by either CCA or the INS.

*Id.* at 448. The GEO defendants have made no showing that they are not in a similar position with respect to the Department of Homeland Security and The GEO Group, Inc.'s contract with the federal government. See also, *Jama vs. United States Immigration and Naturalization Service,* 343 F.Supp.2d 338, 363 (D.N.J. 2004) (*Bivens* action could be brought against a private corporation's employees who worked as guards at an immigration detention facility maintained by their employer under a contract with the INS.

REPORT AND RECOMMENDATION - 14

**B. Alternative Remedies**

For *Bivens* to apply, Mr. Hernandez also must lack an adequate alternative remedy against the GEO defendants for the harms alleged. The Supreme Court's decision in *Malesko* makes clear that to the extent state law provides an adequate alternative remedy, no cause of action will be imposed under *Bivens*. This is true even if no other relief has been provided for under federal law. *See Malesko*, 534 U.S. at 69 ("The absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.")(quoting *Schweiker v. Chilicky*, 487 U.S. 412, 421-22 (1988). Accordingly, the Supreme Court has rejected the assertion that a *Bivens* remedy should be implied "simply for want of any other means for challenging a constitutional deprivation in federal court," and, thus, it does "not matter ... that '[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed.'" *Id*. (quoting *Schweiker*, 487 U.S. at 425). So long as the plaintiff has "an avenue for some redress, bedrock principles of separation of powers" will foreclose "judicial imposition of a new substantive liability under *Bivens*. *Id*. (citing *Schweiker*, 487 U.S. at 425-27); See also *Peoples v. CCA Detention Center*, 442 F.3d 1090, 1103 (10th Cir. 2005) (Courts should not imply a *Bivens* cause of action for a prisoner held in a private prison facility when it is concluded that there exists an alternative cause of action arising under either state or federal law against the individual defendant for the harm created by the constitutional deprivation.)

**C. Alternative Remedies Asserted by Defendants**

The GEO Defendants argue that a *Bivens* cause of action should not be implied because: (1) Mr. Hernandez could sue in state court under RCW 7.24.020, the state Uniform Declaratory Judgment Act to "explore" his rights under the GEO mail policy, or (2) Mr. Hernandez could "arguably claim" that he is a third party beneficiary to the contract between ICE and The GEO Group, Inc. Dkt. 12, p. 10. The GEO Defendants also argue that there is no basis for extending a

REPORT AND RECOMMENDATION - 15

*Bivens* cause of action when Mr. Hernandez was afforded due process in his disciplinary hearing. *Id.*, p. 9. The Court finds each of these arguments to be without merit.

### (1) Declaratory Judgment Act - RCW 7.24.020

RCW 7.24.020 provides that:

> A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

"The purpose of the Declaratory Judgment Act is to declare rights not to execute them." *Peoples Park and Amusement Ass'n v. Anrooney*, 200 Wash. 51, 59, 93 P.2d 362 (Wash. 1939). A declaration will not be made as to the rights of parties under the Declaratory Judgment Act where it appears that the controversy relates to acts which have already been committed and for the redress of which there exists an action at law. *Id.* See also *National Indemnity Co. v. Smith-Gandy, Inc.*, 50 Wash.2d 124, 128, 309 P.2d 742 (1957) ("the court may determine issues of fact 'necessary or incidental' to the declaration of legal relations"). However, resolution of negligence and proximate cause questions must be left to the trial court in the underlying tort action. *United Pac. Ins. Co. v. Guaranty Nat'l Ins. Co.*, 97 Wash.2d 139, 146, 641 P.2d 173 (1982); *Grange Ins. Ass'n v. Ochoa*, 39 Wash.App. 90, 96, 691 P.2d 248 (1984).

The statute, by its terms, is limited to a determination of a party's "rights, status or other legal relations" arising pursuant to some writing (i.e. "contract, franchise, ordinance, etc."). Here, there is no deed, will, written contract or other writings constituting a contract. The Court can only presume that the GEO Defendants would have Mr. Hernandez pursue an action under RCW 7.24.020 to ask a court to declare his status and/or rights vis-a-vie the terms of the GEO mail policy. However, such an action would not provide an avenue of redress for Mr. Hernandez's claims that the

GEO Defendants violated the terms of the GEO mail policy.   In this action, Mr. Hernandez sues to protect the alleged infringement of constitutional rights that cannot be adequately addressed by a declaration of legal relations under an action under RCW 7.24.020.

### (2)     Third Party Beneficiary

The GEO Defendants assert that Mr. Hernandez "could arguably claim he is a third party beneficiary to the ICE contract with GEO.  Dkt. 12, p. 10.

Parties to a contract are generally presumed to contract for their own benefit and not for the benefit of a third party.  *Burke & Thomas, Inc. v. Int'l Org. Of Masters, Mates & Pilots*, 92 Wn.2d 762, 767, 600 P.2d 1282 (1979).  This presumption is rebuttable upon proof that both of the contracting parties entered into the contract with the intent to benefit a third party, resulting in the creation of a third party beneficiary contract.  *Id*. at 767-68.  Thus, to prevail on this argument, the GEO Defendants must provide proof that, at the time that the Department of Homeland Security contracted with The Geo Group, Inc. for the administration of the NWDC, both of them intended that detainees at the NWDC could claim third party benefits, to include remedies for the unconstitutional actions of the GEO Group's employees. *Id*.; *Vikingstad v. Baggott*, 46 Wn.2d 494, 496-97, 282 P.2d 924 (1955).

Defendants provide no basis for the statement that Mr. Hernandez could "arguably claim he is a third party beneficiary to the ICE contract with GEO."  Defendants have not provided a copy of the contract or any of the terms of the contract.  They have provided the Court with no information to suggest that this is even a viable alternative.

### (3)     Administrative Relief as Bar to Bivens

In this case, the GEO Defendants provided evidence that Mr. Hernandez was found guilty of a mail code violation following an investigation during which his statement was taken; he made

statements before a hearing panel, was found guilty and charged with 16 hours of work without pay, appealed the finding and the appeal was denied. Dkt. 13, pp. 55-58. Defendants conclude therefore, that Mr. Hernandez does not have a valid constitutional claim because the grievance process "provided him a sufficient opportunity to be heard and his position considered." *Id.* For this proposition, the GEO Defendants rely on *Bush v. Lucas*, 462 U.S. 367 (1983), *Chappell v. Wallace*, 462 U.S. 296 (1983), and *Peoples v. CCA Detention Centers*, 422 F.3d 1090 (10th Cir. 2005), aff'd 449 F.3d 1097 (10th Cir. 2005), cert. denied by 549 U.S. 1056 (2006), and cert denied by 549 U.S. 1063 (2006). The GEO Defendants argue that this Court applied *Peoples* before in *Bromfield v. McBurney*, C07-5226RBL/KLS and it should do so again. The Court concludes that the GEO Defendants read these cases too broadly. The undersigned turns first to the GEO Defendants' statement regarding the *Bromfield* case.

In *Bromfield v. McBurney*, the court discussed the GEO Defendants' burden to show the existence of available alternative remedies and noted that, "unlike inmates or other detainees housed in federal prisons, both private and public, the plaintiff did not appear to have access to 'remedial mechanisms' at the Northwest Detention Center, through which he may file grievances concerning the GEO defendants' alleged unconstitutional acts." *Bromfield*, C07-5226RBL/KLS, Dkt. 33, p. 19 (citing *Malesko*, 534 U.S. at 74).[10]

The 'remedial mechanisms' discussed by the Supreme Court in *Malesko* are not present in this case. In *Malesko*, the Supreme Court referred to the Bureau of Prison's Administrative Remedy Program (ARP) (see 28 CFR § 542.10 (2001)) available to federal prisoners. *Malesko*, 534 U.S. at 74. ("Inmates in respondent's position also have full access to remedial mechanisms established by

_____

[10] In a supplemental motion to dismiss, the remaining ICE defendants provided evidence establishing the existence of internal administrative remedies that Mr. Bromfield could have, but did not, avail himself of regarding his claims. *Bromfield*, Dkt. 59. The undersigned found that Mr. Bromfield should be required to exhaust the available administrative remedies prior to seeking redress in federal court. *Id.*, p. 13.

the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's ARP.")  *See e.g., Terrell v. Brewer*, 935 F.2d 1015, 1019 (9th Cir. 1990) (Ninth Circuit joining other circuits in requiring federal prisoner seeking both damages and injunctive relief cannot bring a *Bivens* claim until he or she has first exhausted any administrative remedies with the BOP under 28 CFR §§ 542.10-542.16).

These are comprehensive remedies which permit review by someone with higher authority outside the institution housing a plaintiff.  The administrative remedies offered inmates at the NWDC permit final review by the Warden of NWDC.  These grievance procedures do not equate to the remedial mechanisms set forth in the BOP's Administrative Remedy Program.

### D.    Contrary Factors

To determine whether *Bivens* applies, the Court must determine if there is an indication of contrary Congressional intent or any special factors counseling hesitation as to its application:

> Although *Bivens* applies only to those acting under color of federal law and § 1983 applies only to those acting under color of state law, the rationale underlying *Bivens* is similar to Congress' rationale in enacting § 1983.  The objective in both instances is to make government actors who misuse their governmental authority liable for the consequences of their misdeeds and to provide adequate redress to individuals whose constitutional rights are violated by such conduct.

> However, because there is no statute that expressly authorizes damage awards against federal actors, the Supreme Court has been reluctant to imply such a remedy except where necessary to deter and/or redress violations of fundamental constitutional rights.  *See Bush v. Lucas*, 462 U.S. 367, 374-78, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).  Consequently, *Bivens* actions, generally, have been allowed only in cases where there is no indication of a contrary Congressional intent and there are no 'special factors counseling hesitation.'  *Id*. at 378, 103 S.Ct. 2404.

> A contrary federal intent may be inferred 'when Congress provides an alternative remedy ... [or] by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself ...'.  *Id*.

> Among the special factors that may counsel hesitation are: conflict with federal fiscal policy; the existence of a comprehensive remedial scheme providing meaningful remedies created by Congress; and the unique structure and nature of the military.

REPORT AND RECOMMENDATION - 19

*Sarro v. Cornell Corrections, Inc.*, 248 F.Supp.2d 52 , 57 (D.R.I. 2003), citing *Schweiker v. Chilicky*, 487 U.S. 412, 421-23 (1988); *United States v. Stanley*, 483 U.S. 669, 683-84 (1987); *Chappell v. Wallace*, 462 U.S. 296, 304; *Bush*, 462 U.S. at 380-81, 388.

This case is unlike those cases in which the Supreme Court has declined to apply *Bivens* because it would interfere with federal fiscal policy, civil service regulations, the special nature of the military or other governmental programs or policies. For example, in *Bush*, the Supreme Court refused to recognize a *Bivens* claim for First Amendment violations arising out of a government employment relationship because that relationship was "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush*, 462 U.S. at 368. There the Court held that because the congressionally installed comprehensive administrative system protecting civil servants "provide[d] remedies for employees who may have been unfairly disciplined for making critical comments about their agencies," *id*. at 386 (note omitted), a *Bivens* action was inappropriate even though it assumed a First Amendment violation had occurred and acknowledged that the administrative "remedies do not provide complete relief for the plaintiff." *Id*. at 388.

In *Chappell,* the unique disciplinary structure of the military and Congress' unique activity in the field constituted 'special factors' dictating against a *Bivens*-type remedy in a case where enlisted military personnel alleged that they had been injured by the unconstitutional actions of their superior officers and who had no remedy against the Government itself." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)

And in *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988), the Court considered *Bivens* claims filed by disabled social security beneficiaries who eventually received benefits but who had "not been given a remedy in damages for emotional distress or other hardships because of delays in their receipt of Social Security benefits." The Court held that because "Congress ... has addressed the

problems created by state agencies' wrongful termination of disability benefits' through the creation of wide-ranging administrative remedies, a *Bivens* action would be inappropriate." *Id*. at 429.

In this case, there is no discernable governmental program or policy that would be undermined by applying *Bivens*. On the contrary, recognizing Mr. Hernandez's *Bivens* claim simply would afford him the same remedies that already are available to federal prisoners in federally operated facilities. *See e.g., Sarro*, 248 F.Supp.2d at 62 (citing *Malesko*, 534 U.S. at 71-72).

The Court finds that none of Defendants' alternative suggestions is a sufficient "alternative cause of action," that there is no indication of contrary Congressional intent, and no special factors counseling hesitation in this case. Accordingly, the GEO Defendants' request for summary judgment dismissing Mr. Hernandez' *Bivens* claims on the grounds that *Bivens* should not be extended or that alternative state remedies exist, should be denied.

Having determined that Mr. Hernandez may maintain this *Bivens* action, the undersigned must next analyze the substance of his claims.

## II. Mr. Hernandez's Claims

Mr. Hernandez alleges that the GEO Defendants Nelson, Wigen, Gebalis and Sadler opened and read the contents of the mail addressed to Mr. Diallo outside of his presence. Dkt. 8, p. 5. Mr. Hernandez alleges that this was done in violation of the written polices set forth in the ICE National Detainee Handbook because the letter was not suspicious, did not contain contraband and contained only an invoice from a news organization. *Id*. Mr. Hernandez further alleges that the GEO Defendants opened his mail in retaliation for his litigation activities. *Id*., pp. 6-7.

The GEO Defendants argue that to maintain discipline and security for the benefit of the individuals who reside and work at the NWDC, the warden monitors outgoing mail. Dkt. 13, p. 3. Pursuant to Policy 5.2.1 III.B. all outgoing general correspondence is subject to monitoring, reading

and inspection typically in the presence of the detainee. Dkt. 13, pp. 6-7. Only the warden can authorize the inspection of general correspondence without the detainee being present. *Id.*, p. 7. Pursuant to the ICE National Detainee Handbook, detainees are informed that "[a]ll ... outgoing letters are subject to inspection, for content and contraband." In addition, detainees are informed that they "may send or receive mail to or from anyone they know personally." Dkt. 24, p. 17.

As noted above, Mr. Hernandez does not dispute the constitutionality of the forgoing rules. Rather, he claims that Defendants have failed to follow their own rules and by their actions, the GEO Defendants threaten the "sanctity of the ICE National Standards and they have no penological interest in opening the outgoing correspondence of the Plaintiff where it was clear that there was no contraband." Dkt. 8, pp. 7-8. A careful review of the summary judgment evidence reflects, however, that the GEO Defendants did not fail to follow their own rules.

The undisputed evidence reflects that Mr. Hernandez's mail was opened only by the warden, who did not read the mail beyond inspecting the greeting and affirming the invoice belonged to Mr. Marks. Dkt. 13, p. 3. Defendant Nelson did not open the envelope and she did not read the mail. Dkt. 14, p. 2. Associate Warden Sadler did not read the correspondence and did not open the envelope. Dkt. 15, p. 2.

To maintain discipline and security for the benefit of the individuals who reside and work at the NWDC, the warden monitors outgoing mail. Dkt. 13, p. 3. Pursuant to Policy 5.2.1 III.B. all outgoing general correspondence is subject to monitoring, reading and inspection typically in the presence of the detainee. Dkt. 13, pp. 6-7. Only the warden can authorize the inspection of general correspondence without the detainee being present. *Id.*, p. 7. The evidence in this case reflects that Mr. Hernandez's mail was opened outside of his presence, but was done so only by the warden and was done only for the purpose of confirming that the invoice contained in the envelope belonged to

another detainee.

Pursuant to the ICE National Detainee Handbook, detainees are informed that "[a]ll ... outgoing letters are subject to inspection, for content and contraband." In addition, detainees are informed that they "may send or receive mail to or from anyone they know personally." Dkt. 24, p. 17. In this case, Mr. Hernandez's mail was scrutinized because Defendant Nelson had reason to believe that Mr. Hernandez did not know the addressee because the addressee was a former detainee who was in the Detention Center but released prior to Mr. Hernandez's detention. Dkt. 14, p. 2. On outward inspection of the mail, Officer Nelson saw that the mail contained an invoice for a magazine subscription for US News and World Report. Dkt. 14, p. 2. Ms. Nelson also knew that an invoice from U.S. News and World Report had been logged in as incoming mail to Mr. Marks a few days earlier. *Id*. Upon additional investigation, it was discovered that the Plaintiff had violated policy further by mailing an item for another detainee. *Id*. Thus, Mr. Hernandez's mail was rejected and characterized as contraband because he was attempting to send mail belonging to another detainee, Mr. Marks. Dkt. 13, p. 3.

Warden Wigen states that Mr. Marks' actions have presented security and safety issues. Dkt. 13, p. 3. Mr. Marks has sent communications that are threatening to the facility and to the courts. *Id*. Mr. Marks also facilitates detainee dependence upon him for his own benefit. *Id*. Detainees, particularly newer detainees, are vulnerable to his methods and may often find themselves innocently embroiled in a disciplinary matter because they have done as he has requested in return for assistance in understanding the system. *Id.* Warden Wigen states further that Mr. Hernandez is an individual who has found himself in this very circumstance. *Id*.

Thus, the evidence, viewed in the light most favorable to Mr. Hernandez, reflects that the GEO Defendants were "adher[ing] to their written rules and policies," in the handling of Mr.

REPORT AND RECOMMENDATION - 23

Hernandez's mail.

Mr. Hernandez alleges further that it is his belief that the GEO Defendants "specifically opened the letter in their attempt to retaliate against the person of Plaintiff for filing a legal action against ICE" and "because they wished to find some evidence to use to prevent Antolin Andrew Marks from assisting Plaintiff and others in the legal library." Dkt. 8, p. 6. This allegation, however, is not supported by specific facts or evidence. *See e.g., Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment). The evidence also reflects that review of the contents of Mr. Hernandez's mail was limited to the one official authorized to open and inspect the item. Dkt. 13, pp. 6-7 (Policy 5.2.1 ¶ III B).

Mr. Hernandez also alleges in his complaint that he has "been prejudiced because the Defendants have been opening his legal mail as well as his regular correspondence." Dkt. 8, p. 7. However, there is no evidence before the Court to support this allegation.

Accordingly, because there is no evidence that the GEO Defendants failed to follow their own rules or that they have violated any of Mr. Hernandez's constitutional rights, the undersigned recommends that they are entitled to summary judgment dismissal of the claims against them.

## CONCLUSION

Based on the foregoing, the undersigned recommends that the GEO Defendants' motion for summary judgment (Dkt. 12) be **DENIED** on the grounds that Mr. Hernandez is entitled to sue *Bivens*, but the motion should be **GRANTED** because there are no issues of material fact relating to Mr. Hernandez's claims that they have failed to follow their own rules and no evidence that they have violated any of Mr. Hernandez's constitutional rights.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

REPORT AND RECOMMENDATION - 24

the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 17, 2009**, as noted in the caption.

DATED this __25th__ day of June, 2009.

Karen L. Strombom
United States Magistrate Judge